1

1       IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF IOWA
2              DAVENPORT DIVISION

3

UNITED STATES OF AMERICA,          )
4                                   )
             Plaintiff,             )
5                                   )  ORIGINAL
             -vs-                   )  CRIMINAL NO. 3:08-cr-57
6                                   )
ANGELO LAVELL SCOTT,               )  TRANSCRIPT
7                                   )  OF PROCEEDINGS
             Defendant.            )  SENTENCING HEARING
8                                   )

9

10          TRANSCRIPT OF PROCEEDINGS, held before the Honorable John

11   Jarvey, at the Federal Courthouse, Davenport, Iowa, commencing

12   at 2:32 p.m., June 25, 2009, reported by Linda Faurote-Egbers,

13   Certified Shorthand Reporter and Notary Public for the State of

14   Iowa.

15

16                    APPEARANCES

17   Plaintiff by:          MELISA K. ZAEHRINGER
                            Assistant United States
18                          Attorney
                            131 East Fourth Street
19                          Davenport, IA  52801

20
     Defendant by:          DAVID E. MULLIN
21                          Attorney at Law
                            1636 42nd Street, N.E.
22                          Cedar Rapids, IA  52402

23

24   Reported by:

25   Linda Faurote-Egbers
     Certified Shorthand Reporter

USA vs. ANGELO LAVELL SCOTT

2

1                          INDEX

2    Witness              Attorney              Page

3    Katie Tady           Ms. Zaehringer          7
                          Mr. Mullin             14
4                         Ms. Zaehringer         16
                          Mr. Mullin             17
5                         Ms. Zaehringer         18

6    Mary DeVine          Mr. Zaehringer         19
                          Mr. Mullin             22
7
     Karl Hein            Ms. Zaehringer         25
8                         Mr. Mullin             28

9


10   Government's Exhibits              Offered    Recieved

11   1  -  Conviction RE Paragraph 41        8          9
     2  -  Conviction RE Paragraph 42        8          9
12   3  -  Conviction RE Paragraph 43        8          9
     4  -  US Marshals Booking Information  27         27
13   5  -  Fingerprint Records             11         11
     6  -  Fingerprint Records RE 1-15-99  12         12
14   7  -  Fingerprint Records RE 6-08     12         13
     8  -  Fingerprint Report              21         21
15   9  -  Resume of Mary DeVine           21         21
     10 -  Fingerprint Records              9         10
16

17

18

19

20   Certificate of Shorthand Reporter       52

21

22

23

24

25

LINDA FAUROTE-EGBERS, FCRR, RMR, RPR, CSR IA (622) IL (3715)
131 East Fourth Street, Davenport, IA  52801   563-884-7737

1    THE COURT:  Please be seated.  The record can reflect

2  that we are here in the matter of the United States of America

3  versus Angelo Scott, it is Criminal Case 08-cr-57.  Mr. Scott is

4  before this Court for sentencing, having been found guilty on

5  February 4, 2009, of a conspiracy to distribute over 50 grams of

6  crack cocaine.  He is present and represented by David Mullin.

7  The government is represented by Melisa Zaehringer.

8    I have received and reviewed the Presentence Report in

9  preparation for sentencing.  I have also received the

10  defendant's Sentencing Memorandum.  I have also today received a

11  number of exhibits, ten of them, I guess to be offered by the

12  government in the course of this sentencing.

13    The government alleges that Mr. Scott has been

14  convicted of two prior felony drug offenses.  The defendant

15  contends that he has not been convicted and so I think the

16  appropriate place to begin this hearing is to resolve the

17  factual dispute as to whether this defendant has been convicted

18  of one or more felony drug offenses.  Mr. Mullin?

19    MR. MULLIN:  Thank you, Your Honor.  There was also

20  the question of the Motion to Discharge Counsel filed on May 14,

21  2009, that's at docket record 112.  We have not had a ruling on

22  the Motion, the pro se Motion that he filed.

23    THE COURT:  What is the reason for that?

24    MR. MULLIN:  It was filed by him so I would have to

25  have him answer the Court's question on that, Judge.

4

1      THE COURT:  Mr. Scott, why do you want to replace Mr.

2  Mullin?

3      THE DEFENDANT:  On May 14th I filed a Motion to

4  Discharge Mr. Mullin as counsel because I have received

5  information from Mr. Mullin that he wasn't going to investigate

6  the post trial Motions.  He planned to do the post trial Motions

7  and he told me that he would do the Motions, but he never went

8  forth with it.  He just said he was going to go off the

9  government and what they allege and that they were going to have

10  the burden of proving it to me at sentencing.

11      I have several witnesses I wanted to come forth,

12  several witnesses I want to present for the purpose of

13  sentencing, but Mr. Mullin decided that he didn't want to go

14  forth with it and I had no say in whatsoever in how the

15  Sentencing Memorandum was filed or the objections.  I just was

16  able to object and talk to Mr. Mullin by phone and he filed

17  everything without my approval.

18      THE COURT:  What witnesses did you want to call for

19  what purpose?

20      THE DEFENDANT:  For the purpose of the alleged prior

21  convictions from Chicago, Illinois.

22      THE COURT:  Who did you want to call and what would

23  they say if called?

24      THE DEFENDANT:  The probation office as well as it was

25  listed on -- it was listed in the paper work of my Presentence

1   Investigation Report as to the dates, 2-28-97 I believe was the

2   date that I was alleged to have been convicted and charged with

3   possession with controlled substance.

4          THE COURT:  Who in the probation office in Chicago did

5   you want to call as a witness?

6          THE DEFENDANT:  That's why I filed the Motion.  Mr.

7   Mullin, we had -- by the Court we approved -- you approved to

8   have us -- funds given to us to have an investigation, a private

9   investigator to investigate the case when we was doing

10  investigation for pretrial.  He let me know that he still had

11  the investigator on standby for any purpose of investigation

12  therefore after proposed Motion purposes as well.

13         Well, I asked him to go forth and investigate it, he

14  told me himself that he would go to Chicago if the government

15  did not provide the fingerprint analysis to the Court, and

16  therefore right now today the government only has one

17  fingerprint record of one case and they alleging that because

18  the case was ran concurrent, that the second case is, in fact,

19  me.

20         THE COURT:  What objections did you want him to file

21  to the Presentence Report that weren't filed?

22         THE DEFENDANT:  I wrote him a letter and gave him the

23  letter and told him exactly what Motions -- what Motions I

24  wanted and what objections I wanted to be filed and none of them

25  were incorporated into the Presentence Report that's done right

6

1   now.

2           THE COURT:  Can you identify any of those for us

3   today?

4           THE DEFENDANT:  As -- as far as I know, the prior

5   convictions was the main purpose of me wanting to discharge Mr.

6   Mullin because he didn't handle that correctly, the prior

7   convictions.

8           THE COURT:  And what was it about his representation

9   that you believe was handled incorrectly?

10          THE DEFENDANT:  Because he promised me hisself that he

11  would go directly to Chicago, Illinois, and go and review the

12  records and review the files.  Everything that has been

13  presented has been presented by the government.  Nothing on our

14  part has been -- nothing has been on our part to present any

15  type of defense in any way that would be in my favor.  Nothing

16  in my favor has been presented.  Everything that is on the

17  burden of the government and just going to let them do it.

18          Well, it sounds crazy to me honestly because he told

19  me personally in a phone conversation and every time we have a

20  phone conversation, he just totally -- doesn't go forth with the

21  call.  He doesn't go forth with what we were talking about.  He

22  wants everything to be on paper and he writes me back to say

23  whatever he wants to say in the letter I guess for purposes to

24  cover himself, but we have the client-attorney privilege right

25  and so we don't have the purposes of recording conversations or

7

1    that I know of that the conversations are recorded to say this

2    is my evidence to say the conversation was taking place between

3    me and Mr. Mullin.  I can't present that to the Court because

4    that's between me and Mr. Mullin and that's a client-attorney

5    privilege so that's my evidence, the conversation that we had

6    amongst us.

7              THE COURT:  The Motion for Substitution of Counsel is

8    denied.  Ms. Zaehringer, are you prepared to go forward with

9    evidence today?

10             MS. ZAEHRINGER:  Yes, Your Honor.

11             THE COURT:  Go ahead.

12             MS. ZAEHRINGER Your Honor, the government would call

13   Katie Tady.

14                            KATIE TADY,

15   witness herein, called as a witness by the government, after

16   having been first duly sworn, was examined and testified as

17   follows:

18             THE COURT:  Go ahead.

19                           EXAMINATION

20   BY MS. ZAEHRINGER:

21        Q.   Can you state your name for the record and spell your

22   last name?

23        A.   Katie Tady, T-a-d-y.

24        Q.   Where are you employed?

25        A.   U.S. Probation.

8

1        Q.    How long have you been employed there?

2        A.    Since February 2008.

3        Q.    And what job duties do you have?

4        A.    I am assigned to the presentence unit.

5        Q.    Did you write a Presentence Report for this defendant,

6   Angelo Lavell Scott?

7        A.    Yes.

8        Q.    During your investigation of the case did you get

9   certified convictions corresponding with Paragraphs 41, 42, and

10  43?

11       A.    Yes.

12       Q.    In looking at Government's Exhibit 1 do you recognize

13  that?

14       A.    Yes.

15       Q.    What do you recognize that to be?

16       A.    It's a certified court document for the conviction

17  listed 41 in the Presentence Report.

18       Q.    And Government's Exhibit 2?

19       A.    It's the certified court documents for the conviction

20  listed in 42 of the Presentence Investigation.

21       Q.    And Government's Exhibit 3?

22       A.    It's conviction number 43, the certified court

23  documents for that.

24            MS. ZAEHRINGER:  Move to admit Government's Exhibits

25  1, 2, and 3.

1            MR. MULLIN:  No objection.

2            THE COURT:  They are received.

3            MR. MULLIN:  No objection, Your Honor.

4            THE COURT:  They are received.

5    BY MS. ZAEHRINGER:

6        Q.   During the investigation did you write a letter

7    indicating you would like the fingerprint cards to the

8    convictions out of Cook County?

9        A.   I contacted the Chicago Police Department and obtained

10   the fingerprint records for the conviction -- one of the

11   convictions that was objected to by the defendant.

12       Q.   Looking at Government's Exhibit 10, do you recognize

13   that?

14       A.   Yes.

15       Q.   What do you recognize that to be?

16       A.   It is a letter I received back from the Chicago Police

17   Department letting me know of the defendant's fingerprint

18   records and more specifically the one listed in Paragraph 41 of

19   the Presentence Report.

20       Q.   The ones that were sent back to you include the one he

21   objected to as well as the other fingerprints that he did not

22   object to?

23       A.   Correct.

24            MS. ZAEHRINGER:  Move to admit Government's Exhibit

25   10.

1          MR. MULLIN:  Your Honor, we object under Rule 803,

2     foundation as to the content of those letters.  She can

3     certainly testify as to what she did, but now she is -- the

4     government is trying to use a document purportedly from Chicago

5     police when there are no -- no foundation has been laid as to

6     that document.  It is not self-authenticated, it is not

7     certified, and we don't think that it comports with foundation

8     requirements and therefore hearsay under Rule 803.

9          THE COURT:  Thank you.  The objection is overruled.

10    Ten is received.  Hearsay evidence that is determined by the

11    Court to be reliable may be received at sentencing.  This is a

12    reliable exhibit and it has circumstantial evidence and it does

13    relate to the convictions set forth in Government's Exhibit 1.

14    BY MS. ZAEHRINGER:

15         Q.   After obtaining the fingerprints from Cook County, did

16    you take those along with other fingerprint cards over to a

17    latent print examiner?

18         A.   Yes.

19         Q.   Looking at Government's Exhibit 5, can you tell us

20    what that document is?

21         A.   This document is the fingerprints that I received for

22    conviction 41 and I took them to Mary DeVine at Rock Island

23    Police Department and had her compare those fingerprints to his

24    current fingerprints that were in the Joint I-Mate Booking

25    System.

1       Q.   Government's Exhibit 5, was that taken out of

2  Government's Exhibit 10?

3       A.   Yes.

4            MS. ZAEHRINGER:  Move to admit Government's Exhibit 5.

5            MR. MULLIN:  Same objection, Your Honor.

6            THE COURT:  Received.  Overruled.

7  BY MS. ZAEHRINGER:

8       Q.   Government's Exhibit 6, can you explain that document?

9       A.   Those are his fingerprint records from his arrest on

10  January 15, 1999.

11      Q.   And what was that arrest for?

12      A.   Possessing cannabis.

13      Q.   Out of what county?

14      A.   Cook County.

15      Q.   And what relevance do these fingerprints have in

16  reference to the defendant's objections?

17      A.   Well, in Paragraphs 41, 42, and 43, which the

18  defendant objected to, a warrant was issued on I believe August

19  27th for his arrest.  He was arrested on January 15, 1999, for a

20  separate charge, however, the probation officer assisting in the

21  Northern District of Illinois thought that he was also arrested

22  on that date for the three convictions --

23            MR. MULLIN:  Objection, Your Honor.  She is now

24  testifying as to what some non-existent witness thinks the

25  records say.  If we could have a continuing objection to any

1   testimony about Exhibits 5 and 10 due to lack of foundation.

2           THE COURT:  You can have that continuing objection.

3   Your objection is overruled.

4   BY MS. ZAEHRINGER:

5       Q.   Can you continue?

6       A.   Yes.  He thought that the defendant was arrested on

7   January 15, 1999, for possessing cannabis as well as outstanding

8   warrants in convictions 41, 42, and 43.

9           MS. ZAEHRINGER:  Move to admit Government's Exhibit 6.

10          MR. MULLIN:  Same objection, Your Honor.

11          THE COURT:  Received.

12  BY MS. ZAEHRINGER:

13      Q.   Can you tell us what Government's Exhibit 7 is?

14      A.   Yes, that is his fingerprints taken in I believe June

15  of '08 when he was arrested for this offense.

16      Q.   Do you know who those fingerprints were taken by?

17      A.   I believe they were taken by Karl Hein.

18          MS. ZAEHRINGER:  Move to admit Government's Exhibit 7.

19          MR. MULLIN:  One moment, Judge.  I don't believe I

20  have Exhibit 7.

21          MS. ZAEHRINGER:  It should be attached to Government's

22  Exhibit 5.

23          MR. MULLIN:  Just for clarification, these are from

24  Cook County?

25          THE WITNESS:  No, those are taken through the Joint

1    I-Mate Booking System.

2    BY MS. ZAEHRINGER:

3        Q.    Who were the fingerprints taken by?

4        A.    By Karl Hein in the U.S. Marshals Service.

5              MR. MULLIN:  No objection, Your Honor.

6              THE COURT:  Seven is received.

7    BY MS. ZAEHRINGER:

8        Q.    Looking at 5 through 7, what did you do once you

9    obtained these three finger cards?

10       A.    I took them over to Mary DeVine at Rock Island Police

11   Department and she analyzed them.

12       Q.    After she analyzed them did you get them back from

13   her?

14       A.    Yes.

15       Q.    What notations, if any, did she make on Government's

16   Exhibits 5 through 7?

17       A.    She signed and dated each one.

18       Q.    Upon receiving these fingerprint cards back from Mary

19   DeVine did she also give you a report as far as her

20   evaluation?

21       A.    Yes.

22       Q.    In evaluating the journal entries or the convictions

23   in Government's Exhibits 1, 2, and 3, do those -- are those

24   accurately reflected in the Presentence Report?

25       A.    I believe so.

14

1           MS. ZAEHRINGER:  I have no further questions.

2           THE COURT:  Mr. Mullin?

3           MR. MULLIN:  Thank you.

4                         EXAMINATION

5    BY MR. MULLIN:

6      Q.   Looking at Exhibit 10, do you have that in front of

7    you?

8      A.   Yes.

9      Q.   It is purportedly signed by a Jesse McMullen.  Do you

10   see that?

11     A.   Yes.

12     Q.   Do you know Mr. McMullen?

13     A.   No.

14     Q.   Do you recognize his signature?

15     A.   No.

16     Q.   So I understand, in Paragraph 41 of the Presentence

17   Report, that's a conviction from April 24th of 1998, correct?

18     A.   Yes.

19     Q.   And you attempted to obtain from the Cook County Clerk

20   of Court fingerprint evidence for that file, correct?

21     A.   No, I obtained fingerprint records from the Chicago

22   Police Department.

23     Q.   My understanding is that you attempted to get them

24   from Cook County, am I correct, or right?

25     A.   I originally tried to get them from Cook County Jail,

15

1    not the Court.

2        Q.    Cook County Jail.  Thank you.  And you were not

3    successful in obtaining those from Cook County Jail?

4        A.    Correct.

5        Q.    And then you went to --

6        A.    The Chicago Police Department.

7        Q.    The Chicago Police Department and you say that someone

8    sent you fingerprint evidence related to the conviction in

9    Paragraph 41 of the Presentence Report?

10        A.    Correct.

11        Q.    And you attempted to do the same for the conviction at

12    Paragraph 43 of the Presentence Report?

13        A.    Correct.

14        Q.    But you were not able to obtain any fingerprint

15    evidence, correct?

16        A.    Correct.

17        Q.    Do you have your Presentence Report in front of you?

18        A.    Yes.

19        Q.    I believe that you scored Mr. Scott with additional

20    levels for an offense occurring within two years after release

21    as well as for while on probation?

22        A.    Correct.

23        Q.    Do you have the records for the offense for which you

24    say he was on probation at the time of the current offense?

25        A.    Not with me right now.

1   Q. Isn't that an offense where he received 30 days

2 suspended?

3   A. I'd have to look.

4   Q. You can look through your report at the earlier

5 conviction.

6   A. That is what the report says at Paragraph 48.

7   Q. Do you recall where you got the information that he

8 had one-year probation on a 30-day suspended sentence case?

9   A. It was indicated on the Judgment for that conviction.

10   MR. MULLIN:  That's all the questions I have for this

11 witness related to the issue of the prior convictions.

12   THE COURT:  Ms. Zaehringer, anything else?

13   MS. ZAEHRINGER:  Your Honor, as to Paragraph 48, it is

14 my understanding that doesn't have any bearing on the

15 defendant's sentence if the Court finds the defendant has two

16 prior drug felonies; however, I can submit evidence as to that

17 if the Court is wanting to hear that evidence or I'd just

18 reserve that based on the Judge's -- on your determination

19 whether he's --

20   THE COURT:  We are just resolving the one issue right

21 now at this time.

22   MS. ZAEHRINGER:  I have a few more questions.

23        FURTHER EXAMINATION

24 BY MS. ZAEHRINGER:

25   Q. As to Government's Exhibit 10, tell me how you

1   obtained that document.

2       A.   I called the Chicago Police Department and I was able

3   to get ahold of their Records Department and I was able to get

4   ahold of Jesse McMullen himself and talk to him about the

5   fingerprint records that I needed.

6       Q.   Did you have conversations with him about the

7   different names on the fingerprint cards?

8       A.   Yes.

9       Q.   What else did you talk about?

10      A.   I indicated that he had numerous aliases and that

11  these were the dates of arrests that I was looking for.

12      Q.   And upon your request did he indicate he would try to

13  help you out and send you the different fingerprint cards that

14  he had?

15      A.   Yes.

16           MS. ZAEHRINGER:  I have no further questions.

17           MR. MULLIN:  Judge?

18                        FURTHER EXAMINATION

19  BY MR. MULLIN:

20      Q.   So you were the one who told Jesse McMullen about what

21  you thought were Mr. Scott's aliases?

22      A.   Yes, I told him that I had three different arrest

23  dates that I needed to verify fingerprint analysis for.

24      Q.   And did you provide the aliases to Mr. McMullen?

25      A.   Originally he asked for the defendant's name and I

1   told him he had numerous aliases that he was arrested under

2   therefore I just needed these dates of arrests for these docket

3   numbers.

4       Q.   Again, so you provided him with the alias names?

5       A.   I do not recall.

6       MR. MULLIN:  Thank you.

7                  FURTHER EXAMINATION

8   BY MS. ZAEHRINGER:

9       Q.   Just one follow-up.  When he was looking up the print

10   cards to submit to you, did he reference an IR number when you

11   were speaking with him?

12       A.   Yes.

13       Q.   And what did he tell you regarding the IR number?

14       A.   He provided me the IR number which is listed in

15   Exhibit 10, that's right there.

16       Q.   And what is the IR number?

17       A.   I am not for sure.

18       MS. ZAEHRINGER:  I have no further questions.

19       MR. MULLIN:  Nothing, Judge.

20       THE COURT:  Thank you.  Call your next witness.

21       MS. ZAEHRINGER:  The government calls Mary DeVine.

22                  MARY DeVINE,

23   witness herein, called as a witness by the government, after

24   having been first duly sworn, was examined and testified as

25   follows:

1                          EXAMINATION

2    BY MS. ZAEHRINGER:

3        Q.    State your name for the record and spell your last

4    name.

5        A.    Mary DeVine, D-e cap v-i-n-e.

6        Q.    Where are you employed?

7        A.    Rock Island City Police Department.

8        Q.    How long have you been employed there?

9        A.    Almost 24 years.

10       Q.    And what is your official title?

11       A.    I am a criminalist.

12       Q.    And what does a criminalist do?

13       A.    It actually involves forensic science with respect to

14   law enforcement.  There are three specific duties that I am

15   responsible for.  I am a crime scene investigator, latent

16   fingerprint examiner, and I also analyze cannabis.

17       Q.    And how long have you been doing that?

18       A.    22 and a half years.

19       Q.    What type of training do you have to do this activity?

20       A.    I've gone to schools presented by the FBI, schools

21   presented by the State of Illinois, and I also attend yearly

22   conferences presented by forensic science organizations.  I

23   belong to forensic science organizations and a national

24   association for identification as well as the Illinois Division

25   of the IAI.  In addition I've sat on the board of the Illinois

1    division for a number of years.  I have been its past president,

2    I've also been on its board of directors or executive board, I

3    have also been the editor of the newsletter and I've been on the

4    training committee for years.

5        Q.    And you were contacted by the probation department in

6    this case, is that correct?

7        A.    Yes.

8        Q.    And what documents did she give you in order to do a

9    comparison?

10       A.    There were three copies of inked impressions.

11       Q.    Showing you what's been marked as Government's

12   Exhibits 5, 6, and 7, do you recognize those?

13       A.    Yes.

14       Q.    And what do you recognize those to be?

15       A.    They are inked impressions.

16       Q.    Are those the inked impressions that the probation

17   department asked you to review?

18       A.    They're copies.

19       Q.    Okay.  And how do you know that those are the ones

20   that you reviewed?

21       A.    My initials, my police number, and the date on which I

22   did the comparisons on the inked impressions.

23       Q.    Upon doing the analysis, did you do a report?

24       A.    Yes.

25       Q.    Showing you Government's Exhibit 8 --

21

1      A.    Yes.

2      Q.    -- do you recognize that?

3      A.    Yes.

4      Q.    What do you recognize that to be?

5      A.    This is a report I generated after my completion of

6  the examination.

7      Q.    And Government's Exhibit 9, do you recognize that?

8      A.    Yes.

9      Q.    What do you recognize that to be?

10     A.    This is my resume as well as my list of training.

11           MS. ZAEHRINGER:  Move to admit Government's Exhibits 8

12  and 9.

13           MR. MULLIN:  Judge, same objection.  This witness is

14  being asked to use documents that -- for which there was

15  insufficient foundation laid and therefore her opinion is based

16  on that and we just wish to renew our objection.

17           THE COURT:  Eight and nine are received.  Overruled.

18  BY MS. ZAEHRINGER:

19     Q.    Can you tell us what you did once you received these

20  ink cards?

21     A.    I compared each ink card to each other to determine

22  whether or not the impressions were made by one in the same

23  person.

24     Q.    Can you briefly describe how that is done?

25     A.    Actually in this particular case it is not that

1   complex.  It is what I do when I make a comparison, you simply

2   look for the ridge detail within each finger and in this case

3   all the fingers were different, but generally you pick out one

4   in each one so I chose the number two finger and in looking for

5   the detail to make sure or to see that the detail is the same in

6   each finger, and I am looking specifically for points of

7   interest like bifucations and ridges and dots to make sure that

8   they have the same relationship and positioning within each

9   finger.

10      Q.   Is there a reason why you picked finger number two

11  versus the other -- any of the other fingers?

12      A.   It appeared to be the most cleanest print of the ten

13  with each one.

14      Q.   And in comparing the Government's Exhibits 5, 6 and 7,

15  did you form an opinion after reviewing those?

16      A.   Yes.

17      Q.   And what is your opinion?

18      A.   They were all made by the same person.

19          MS. ZAEHRINGER:  I have no further questions.

20                          EXAMINATION

21  BY MR. MULLIN:

22      Q.   Ma'am, the card that you received from Chicago, did it

23  have a defendant's name on it?

24      A.   I'd have to look at the card again, sir.  I am not

25  sure which one you are referring to.

1    Q.   Exhibit 5, do you have it in front of you?

2    A.   No, sir.

3    Q.   DO you see that, ma'am?

4    A.   Yes, sir.

5    Q.   Is there a name on that card?

6    A.   Angelo Payne.

7    Q.   Do you have Exhibit 7 in front of you?

8    A.   I have no exhibits in front of me, sir.

9    Q.   Looking at Exhibit 7, do you see that?

10   A.   Yes, sir.

11   Q.   So you compared Exhibit 5 which you were told came

12   from Chicago for an Angelo Payne, the right index finger, to an

13   index card and right index finger for something that was taken

14   here in Davenport?

15   A.   Again, I was asked to compare Exhibit Number 7 with

16   Exhibit Number 5.  The rest of it is almost immaterial to me.  I

17   took a look and examined it and they are one in the same

18   person's.

19   Q.   Do I understand your testimony that in Exhibit 5 that

20   that fingerprint you believe is identical to the index

21   fingerprint in Exhibit 7?

22   A.   Again, it is made by one in the same person.  I am not

23   saying that they're carbon copies, it's made by one in the same

24   persons.  Sometimes when an impression is rolled, depending on

25   how it is rolled, in this case with Exhibit Number 7 it looks

24

1    like it has been exaggerated out whereas with Exhibit Number 5

2    it looks more flat down and slightly rolled, but it is one in

3    the same person's.

4         Q.   And thank you.  Your opinion that it is one in the

5    same person, I take it is based because they look alike?

6         A.   Absolutely not.

7         Q.   Because you would agree that in Exhibit 5 the circle

8    or the curls go sort of up and down, it's an oval that is

9    lengthwise north and south whereas in Exhibit 7, it appears to

10   be flattened off to the left oval.  Do you see that?

11        A.   The way the impressions were left on the ink cards are

12   slightly different; however, that does not subtract the fact

13   that they are indeed still made by one in the same persons.

14   They both display the same relationship and amount of

15   positioning where the points are located within the impression.

16   They're just one in the same person's.

17        Q.   And you weren't present for -- you didn't take any of

18   these exemplars yourself, did you?

19        A.   That's correct.

20        Q.   And so if each was taken with the finger in the same

21   position, they would have ovals that would be in the same

22   orientation, would they not?

23        A.   Again, it just depends on how the impression was left

24   to begin with.

25        Q.   My question is if the impression was of a fingerprint

25

1   in the same orientation, then the ovals would be in the same

2   orientation as well, correct?

3       A.   If you are simply -- making sure I understand your

4   question, if you simply took the finger and you pressed it down

5   and then you took the finger again and pressed it down, they

6   would definitely look similar to each other, yes.

7       Q.   More similar than Exhibits 5 and 7?

8       A.   Yes.

9           MR. MULLIN:  That is all I have.  Thank you.

10          THE COURT:  Ms. Zaehringer?

11          MS. ZAEHRINGER:  No questions.

12          THE COURT:  Thank you, ma'am.

13          THE WITNESS:  Thank you, sir.

14          MS. ZAEHRINGER:  Government calls Karl Hein.

15          THE COURT:  Please come forward, sir.

16                          KARL HEIN,

17  witness herein, called as a witness by the government, after

18  having been first duly sworn, was examined and testified as

19  follows:

20                         EXAMINATION

21  BY MS. ZAEHRINGER:

22      Q.   State your name for the reporter and spell your last

23  name.

24      A.   Karl Hein, H-e-i-n.

25      Q.   Where are you employed?

1      A.    United States Marshals Service.

2      Q.    How long have you been employed there?

3      A.    Four years, eight months.

4      Q.    Did you talk with Angelo Scott when he was booked in

5  on June 20, 2008?

6      A.    Yes, I did.

7      Q.    When he was booked in did you take fingerprints from

8  Mr. Scott?

9      A.    Yes, I did.

10     Q.    Showing you what's been marked as Government's Exhibit

11  4, do you recognize that?

12     A.    Yes.

13     Q.    What do you recognize that to be?

14     A.    It is photos of Mr. Scott as well as his fingerprints.

15     Q.    And attached, the other documents attached to

16  Government's Exhibit 4, what is contained in there?

17     A.    General booking information from questions that I

18  asked of Mr. Scott to include race, age, Social Security number,

19  general information, as well as any prior history that he may

20  have.  Once the fingerprints were submitted in the JABS, Joint

21  Automated Booking Station System, I received a rap sheet back

22  from the FBI which assists in identifying who we are dealing

23  with such as any prior criminal history from law enforcement in

24  the past, any aliases that may have been used when given to

25  those law enforcement agencies.

1    Q.   So looking at the criminal history portion of Exhibit

2    4, how do you obtain that?   You obtain that merely from the

3    fingerprints themselves?

4    A.   Once they're -- they are submitted in the JABS system

5    and it is a short period of time that we receive back into the

6    computer system a document which we print out from the system

7    here and we include that with each individual's file.

8    Q.   And Government's Exhibit 7, do you recognize that?

9    A.   Yes, that's the photographs as well as fingerprints

10   for Mr. Scott.

11   Q.   And is that identical to the top page of Government's

12   Exhibit 4?

13   A.   Yes.

14        MS. ZAEHRINGER:  Move to admit Government's Exhibit 4.

15        MR. MULLIN:  No objection.

16        THE COURT:  Received.

17   BY MS. ZAEHRINGER:

18   Q.   Do you see the individual whom you printed on June 20,

19   2008, in the courtroom?

20   A.   Yes.

21   Q.   Can you tell me where he is seated and what he is

22   wearing?

23   A.   Yes, Mr. Scott is seated at defense counsel table

24   wearing a two-tone gray jumpsuit with a white long underwear

25   shirt underneath, I would say medium length dread locks.

28

1          MS. ZAEHRINGER:  Let the record reflect he's

2    identified the defendant.  I have no further questions.

3          THE COURT:  Mr. Mullin?

4                         EXAMINATION

5    BY MR. MULLIN:

6          Q.    Looking at Exhibit 4, does it -- does the FBI indicate

7    that Mr. Angelo Scott uses the alias Brandon McIntyre?

8          A.    I don't have that exhibit in front of me, sir.

9          Q.    I'm sorry.  Not a memory test.  I will hand you

10   Exhibit 4.

11         A.    The question again, the name used --

12         Q.    You said it contains aliases, known aliases.

13         A.    Yes.

14         Q.    So starting on page two of nine of the Joint Automated

15   Booking System Limited Official Use Document, the page starting

16   with number three, name used, that was given to the Chicago

17   Police Department last name Payne, P-a-y-n-e, first name

18   Antonio, middle name Lavell.  Right underneath that, underneath

19   number four is Brandon McIntyre.

20         A.    Yes, sir.

21         Q.    And that is the information that the FBI gets from

22   court records such as Cook County court records?

23         A.    Yes.

24         Q.    That is where -- the FBI doesn't independently go out

25   and get it, it is submitted information from court records?

29

1          A.    I would assume.

2          Q.    And when you -- you personally did the fingerprints of

3    Mr. Scott here today?

4          A.    Yes, sir.

5          Q.    Was he cooperative or noncooperative?

6          A.    Cooperative.

7          Q.    I mean, he wasn't fighting with you when you were

8    taking his exemplars?

9          A.    No, sir.

10         Q.    You were able to manipulate his finger as you wished

11   in making the impressions?

12         A.    You could say that.  I don't manipulate.  We're

13   trained at the Federal Law Enfocement Training Academy to use

14   the basic common methods of rolling fingerprints on the

15   fingerprint pad.

16         Q.    I didn't mean anything devious by the manipulation.

17   Let me use a different word.  You were able to handle his

18   fingers and put them where you wanted them on the fingerprint

19   cards?

20         A.    On the fingerprint pad.

21         Q.    Fingerprint pad.  Thank you.

22         A.    Yes, sir.

23               MR. MULLIN:  That is all I have.  Thank you.

24               MS. ZAEHRINGER:  Nothing further.

25               THE COURT:  Thank you.

30

1          MS. ZAEHRINGER:  I have no no other witnesses.

2          THE COURT:  Mr. Mullin?

3          MR. MULLIN:  Just argument.

4          THE COURT:  Let's hear the government's argument

5     first.  They've got the burden of proof.  Walk me through this,

6     how you contend that this shows that he's been convicted of two

7     prior drug felonies.

8          MS. ZAEHRINGER:  Looking at Exhibit 1, and that

9     corresponds with the Presentence Report Paragraph 41, in that

10    report or in that packet it indicates that on 4-24 of '98 the

11    defendant was found guilty and sentenced to probation for 30

12    months and on the third page of that document it indicates that

13    that sentence was to run concurrent with 97-CR-1376001 which

14    corresponds to Presentence Report Paragraph No. 42.

15         THE COURT:  On the third page?  I am sorry.  I don't

16    see it.

17         MS. ZAEHRINGER:  Third page, the first entry, 4-24 of

18    '98 sentence to run concurrent.

19         THE COURT:  I see it.

20         MS. ZAEHRINGER:  You will then see that he had a

21    violation of probation on 3-20-99, he was sentenced to three

22    years.

23         THE COURT:  Wait.  I want to get there.

24         MS. ZAEHRINGER:  On page four.

25         THE COURT:  Yes.

1      MS. ZAEHRINGER:  And on page five the first --

2      THE COURT:  Not 3-20, 3-02?

3      MS. ZAEHRINGER:  Yes, 3-02, I am sorry.  On page five,

4  the top entry, that sentence is to run concurrent with again

5  Paragraph 42 and then 98-CR-11368 which is Paragraph 43.

6      Looking further in the document, the Order Sentence of

7  Probation indicates two case numbers at the very top, again

8  corresponding with this case number and the case number in 42.

9      THE COURT:  What are the case numbers you are

10 referring to?

11     MS. ZAEHRINGER:  97-CR-22682 and 97-CR-13760.

12     THE COURT:  I see it.  Thank you.

13     MS. ZAEHRINGER:  Also on that Order I would like to

14 point out at the bottom of the page where the defendant signed

15 his name, prints his name, on this occasion it is Angelo Payne,

16 he also writes an address of 1533 South Miller and a phone

17 number of 542-5898 which you will see later on in the documents.

18     Turning two pages back in the Order of Sentence and

19 Commitment to the Illinois Department of Corrections, again in

20 that written paragraph in the middle of the document it

21 indicates that this case is concurrent with 97-CR-13760 and

22 98-CR-11368 which again are Paragraphs 42 and 43 and then

23 attached to it is a picture with the date of arrest and just

24 identifying information on Angelo Payne.

25     Government's Exhibit 2 corresponds with Paragraph 42

1    and this is in the name of Antonio Payne.  On the second page it

2    indicates on 4-24 of '98 the defendant was sentenced to

3    probation and that sentence was to run concurrent with

4    97-CR-22682 which is Paragraph 41.  He had a violation of

5    probation and on 3-2 of '99 he was sentenced on that violation

6    and it was to run concurrent with Paragraphs 41 and 43 and

7    that's on page four of the document.

8           Looking back further for the Order of Sentence and

9    Probation, again there's two case numbers at the top, we have

10   the defendant signing the document at the bottom, Antonio Payne,

11   and it lists the same number as he listed on the previous case

12   Order.  Turning back two pages back to DOC, it indicates that

13   this case was run concurrent with Paragraphs 41 and 43.

14          Government's Exhibit 3 in the name of Brandon McIntyre

15   shows that the defendant was sentenced on 6-22 of '98, that's on

16   the second page, and it was to run concurrent with Paragraphs 41

17   and 42.  He had a violation of probation, he was then sentenced

18   again, and those -- that sentence was to run concurrent against

19   Paragraphs 41 and 42 as noted at the bottom of page three.

20          Looking at the Order for Sentence of Probation, at the

21   top of the page where it has the defendant's name, it is -- he

22   has written in Brandon McIntyre, and it says a/k/a Angelo Payne.

23   At the bottom of the document it is again signed by Angelo

24   Payne, same address, as listed in Government's Exhibit 1.

25          Turning back two pages, the Order for Commitment to

33

1    DOC, it indicates in the written paragraph that this case is to

2    run concurrent with Paragraphs 41 and 42.  The back two pages of

3    this exhibit show the defendant's picture along with the

4    information as far as his identifiers and his arrest.  As on

5    Government's Exhibit 2, that corresponds with the conviction

6    in 41 --

7              THE COURT:  42.

8              MS. ZAEHRINGER:  41.

9              THE COURT:  Government's Exhibit 2?

10             MS. ZAEHRINGER:  I'm sorry, Government's Exhibit 5,

11   yes, corresponds with Government's Exhibit 1 which is Paragraph

12   41.

13             THE COURT:  Yes.  Thank you.

14             MS. ZAEHRINGER:  And that was identified by the

15   criminalist and then we contend that the fingerprints in

16   Government's Exhibit 7 and Government's Exhibit 4, 7, which was

17   examined again by Mary DeVine, are prints taken from the

18   defendant sitting before you which matches those prints which

19   were given during the arrest for the conviction in Paragraph 41.

20             THE COURT:  Excuse me.  I thought you said that

21   Exhibit 6 related to the arrest for the convictions in 42 and

22   43.

23             MS. ZAEHRINGER:  Government's Exhibit 6?

24             THE COURT:  Yes.

25             MS. ZAEHRINGER:  Government's Exhibit 6 is a

34

1  fingerprint card that probation got that references an arrest on

2  a marijuana charge, but he was also -- he was arrested on the

3  marijuana charge, but he also had the outstanding warrant for

4  the convictions in 41 and 42.

5           THE COURT:  I understand.  Wait.  41 and 42 or 42 and

6  43?   I think it is 42 and 43 because it shows on 43 a -- a

7  probation thing filed and a warrant being issued on August 27,

8  '98, and then in January he comes into custody right after the

9  fingerprints are taken.

10          MS. ZAEHRINGER:  I didn't write down the testimony

11 when Katie testified to it, but certainly I can ask her for

12 clarification.

13          THE COURT:  Thank you.  Do you have anything else?

14          MS. ZAEHRINGER:  No, Your Honor.

15          THE COURT:  Mr. Mullin?

16          MR. MULLIN:  Yes, Judge.  You start from the -- start

17 from the fact that this is one of those rare sentencing factual

18 questions that Your Honor is directed by law to resolve with a

19 higher -- well, the highest burden of proof, beyond reasonable

20 doubt.  I cite that section of the statute, I believe it is 851,

21 subparagraph C, that factual determinations are to be decided

22 beyond a reasonable doubt and the government has the burdens of

23 proof.

24          You can try to connect the dots from all these things,

25 Judge, you can look at different points on a fingerprint

1   analogy, and I don't mean to be glib about it, Judge, but it is

2   possible that my pupil distance and my distance from my chin

3   would match up with Brad Pitt, but the Court would never be

4   confused by the two and does the Court have before it Exhibits 5

5   and 7?

6           THE COURT:  Yes.

7           MR. MULLIN:  I would ask Your Honor just to take a

8   look at the right index fingerprint, the one that is initialed,

9   for Exhibit 5 and Exhibit 7 and you had an expert witness come

10  in and say they're the same one, she seemed to resist my

11  suggestion that the ovals are in different orientation, I ask

12  Your Honor to take a look at those and consider whether those

13  strike you as a layperson as the same fingerprints.

14          The orientation of the oval seems to be at 90 degrees

15  to one another and that's why I asked the agent, did Mr. Scott

16  in Exhibit 7 was he fighting, offers the fingerprint put down

17  sideways because he was resisting?  No, he was able to put the

18  finger down on the pad and produced an oval that is different

19  from Exhibit 5 to Exhibit 7.  They cannot be the same person.

20          THE COURT:  Come up here, bring Ms. Zaehringer, and

21  show me on here why they can't be the same person.

22          MR. MULLIN:  Why they cannot?

23          THE COURT:  Yeah.  Be loud enough for the court

24  reporter.

25          MR. MULLIN:  Sure.  I am looking upside down, but

1  Exhibit 5, the oval appears to be almost straight up and down,

2  maybe just at eleven o'clock.  The oval in this one, Judge, in

3  Exhibit 7, is turned almost 90 degrees to that in Exhibit 5.

4          THE COURT:  I didn't even know which ones you were

5  referring to.

6          MR. MULLIN:  Looking at Exhibit 1, Judge, the second

7  to last page of Exhibit 1, do you see the --

8          THE COURT:  Just wait a minute.

9          MR. MULLIN:  Sure.  All right.

10          THE COURT:  Go ahead.

11          MR. MULLIN:  Exhibit 1, second to last page, is a

12  photograph of an individual identified as an -- must be a typo,

13  Angleo, A-n-g-l-e-o, with a birthday of 1978.  That's the

14  paragraph that they say is Mr. Angelo Scott.  I mean, the

15  individuals do not look -- I'm leaving it to Your Honor in

16  looking at that whether the picture depicted there is the

17  defendant 10 years later that is in this court.

18          The significance of the -- again, Your Honor overruled

19  our objection to use hearsay evidence, but Your Honor doesn't

20  have to treat hearsay evidence the same as it does non-hearsay

21  evidence.  Even if you admit it, you give it the weight that

22  Your Honor believes it deserves.  They thought it was important

23  enough to obtain fingerprint evidence and information in 41.

24  When they say they have fingerprint evidence for the conviction

25  in Paragraph 41, it is a euphemistic way of saying we've got

1   evidence for the conviction in paragraph 43.  We don't even have

2   fingerprint evidence.

3        We've heard no testimony today from law enforcement

4   officers that identifies this person as the individual in

5   Paragraph 43 of the Presentence Report.  Not a prosecutor, not a

6   defense counsel, not a Department of Corrections person, not an

7   Affidavit from any of these people.  It is just well, in a court

8   record there's a handwritten thing which is then tracked in

9   Exhibits 1, 2, and 3, picked up by the clerical staff, that it

10  is these case numbers.

11       One transposition of a letter in there, in, Judge, and

12  it is a Brandon McIntyre who is not Angelo Scott and so for the

13  evidence here, again, the decision is not whether he gets an

14  enhancements of an extra 24 months.  It is the difference

15  between life, never getting out of prison, and not getting free

16  today, but having a shorter sentence, a mandatory minimum of 10

17  years, 20 mandatory if Your Honor believes one of these

18  convictions is Mr. Scott for which they at least have

19  fingerprint evidence then it would be a 20 years mandatory under

20  the statute.

21       For all of those reasons, Judge, we think the

22  government has failed in its proof beyond a reasonable doubt

23  establishing that both Paragraphs 41 and 43 of the Presentence

24  Report are convictions of this defendant.  Thank you.

25       THE COURT:  In that you have invited me to second

1  guess the fingerprint examiner and to examine the prints for

2  myself, open up -- just stop.   Wait.   Answer my question first.

3  You, please, open up Exhibits 1, 2, and 3 to the place where the

4  defendant in those three cases signed the Order and the Sentence

5  of Probation and tell me that the same person didn't sign those

6  three.

7          MR. MULLIN:   Judge, I -- I object to the

8  characterization that I was inviting you.   This is just an

9  expert and Your Honor can accept or reject their testimony like

10  any other -- any other witness.   I don't think that a

11  fingerprint expert comes in with some presumption of

12  infallibility that the Court can't disregard that so I don't

13  want a ruling based on the fact that one person looking at two

14  prints which do not look to some of us as the same fingerprint,

15  she says it's the same fingerprint, Your Honor can either accept

16  or reject her evidence, but I will look at the --

17          THE COURT:   I am fully aware of that.   I don't have to

18  believe anything that is said in court.

19          MR. MULLIN:   Again, I've looked through these, Judge,

20  I am not sure I am going to be put on the witness stand whether

21  or not they are the same or not, but they are the same printed

22  name, Angelo Payne, and the same phone number.   We don't know in

23  how many other cases in the clerk's records in Cook County have

24  that same alias.   We don't know, Judge.

25          THE COURT:   Handwriting doesn't look vaguely familiar

39

1  to you?

2          MR. MULLIN:  I will double check it, Judge.  One is

3  Antonio Payne and one is Angelo Payne.  Looking at Exhibits 1

4  and 2, Your Honor, they're different first names and the P's

5  look different in Exhibit 1, the P is just like a printed P, it

6  has a little serif in Exhibit 2, and in the -- if in the few

7  seconds that I have been asked to look at those, those are two

8  differences that I am able to find.

9          THE COURT:  Thank you.  Do you have any other argument

10  you would like to make?

11          MR. MULLIN:  One moment, Your Honor.

12          (An off-the-record discussion was held.)

13          MR. MULLIN:  We would point out that in Exhibit 3, I

14  don't think there is -- that's Angelo Payne, but I believe

15  that's a -- well, I have no -- I have no opinion on Exhibit 3

16  about the similarities of the signatures, but they do purport to

17  be in the same name, Angelo Payne, on both of those.  Judge,

18  that's all the argument that I have.

19          THE COURT:  Thank you.  There is no question in my

20  mind.  This is the same individual convicted of the offenses in

21  Paragraphs 41, 42, and 43 of the Presentence Report and it is

22  the same Angelo Scott before the Court today.  I make that

23  finding beyond a reasonable doubt.  There is absolutely no doubt

24  in my mind that it is the same individual.  There are just way

25  too many indications in here from the fingerprints to the

1  handwriting to the fact of the concurrent sentences to the fact

2  of the defendant's signing for concurrent sentences to the

3  identification numbers to the similarity in the addresses, the

4  telephone number, the repeated similarities, although not

5  identical in the date of birth information, there's no question

6  in my mind, these are the same individual and the defendant,

7  Angelo Scott.

8          I find that Mr. Scott has been convicted of two prior

9  drug felony drug offenses as that term is stated in 21, United

10  States Code, Section 841(b)(1)(A).

11          I think the other sentencing issues are now moot.  I

12  think you have argued what you would like to make on the

13  applicability of those offenses though first, whether they

14  qualify under 841(b)(1)(A) because you contend they are juvenile

15  offenses?

16          MR. MULLIN:  Yes, Judge.  We have several arguments

17  that we have advanced in our Sentencing Memorandum.  The -- I

18  don't believe and I could have overlooked it, Judge, I did look

19  fairly carefully, I didn't find anything in the Eighth Circuit

20  directly on point that says that you can use a juvenile offense.

21          THE COURT:  These aren't juvenile offenses though.

22  They were in adult court, committed before he was 18 years old.

23          MR. MULLIN:  I apologize.  Your Honor is absolutely

24  correct.  These offenses were as far as I can tell in my look at

25  it they are juvenile court offenses, they are adult convictions,

1 but nevertheless they were -- the conduct complained of was done

2 while he was 16 and 17 years of age and in the Supreme Court

3 case that I looked at on use of juvenile conduct and punishing

4 people like they were adults, the closest thing I could find was

5 a death penalty case where they said involving standard of

6 morality, he just can't, they can't use what a juvenile did to

7 give them the ultimate sentence.

8          My analogy is that this is the functional equivalent

9 of a death sentence in certain respects.  Whether it is a death

10 sentence or life imprisonment, Mr. Scott risks never leaving a

11 federal facility other than in a pine box and it is the harshest

12 penalty that we have next to a death sentence, same reasons that

13 applied I believe in that Supreme Court case ought to apply in

14 this situation that we just don't hold adults to the same

15 punishments that we do juveniles, whether it is in a juvenile

16 court case or whether it is in an adult case as a juvenile, it

17 is still conduct done by people who can't vote, who can't --

18 aren't trusted by society to possess alcohol or vote and

19 therefore we just treat juveniles and juvenile records it seems

20 differently and for those reasons -- and I also cite Eighth

21 Amendment concerns about using on their records those offenses

22 to give him a life sentence, that that would constitute a

23 deviation of involving standards of morality by society and

24 therefore runs afoul of the Eighth Circuit ban on cruel and

25 unusual punishment.  Thank you.

1    THE COURT:  Eighth Amendment.  Yeah.  Ms. Zaehringer?

2    MS. ZAEHRINGER:  Your Honor, it is clear that we can't

3    use juvenile adjudications to enhance sentences, but it is clear

4    that we can use adult records and based on the record submitted

5    before this Court these records of this defendant are adult

6    convictions and therefore should be used.

7    THE COURT:  They are adult convictions committed by

8    the defendant before he was 18 years old.  It is certainly harsh

9    to sentence someone to life imprisonment for two prior

10   possession charges and a conspiracy such as he was convicted for

11   in this case.  Congress in adopting or enacting 841(b)(1)(A)

12   could have said felony drug trafficking crime, it didn't, it

13   said felony drug crime.  These certainly qualify under Illinois

14   law as felony drug crimes.

15       As applied to this defendant, he has the conviction

16   for possession of a controlled substance in '97, the receipt,

17   possession, or selling of a stolen vehicle in '98, the

18   possession of a controlled substance felony in '98, armed

19   robbery, armed with firearm in 2003, domestic battery in 2004,

20   assault in 2005, assault in 2007 for which there's a failure to

21   appear and a warrant remains outstanding, another possession of

22   a controlled substance in 2007, another possession of a

23   controlled substance in 2007, so it wasn't -- these offenses

24   didn't happen in a vacuum.  Still, the plain language of the

25   statute requires that the Court impose a sentence.  It is harsh,

1   but does not run afoul of the Eighth Amendment prohibition on

2   cruel and unusual punishment.

3            I would hear from you, Mr. Mullin, then from Mr. Scott

4   then from Ms. Zaehringer before imposing sentence.

5            MR. MULLIN:  Is it Your Honor's intention not to go

6   over the drug quantities in order to get a reversal on the life

7   sentence?  We'd have to have a resentencing then and take up the

8   issue of where he would object the Guideline but for the life

9   sentence and our issue of downward variance or is it Your

10  Honor's intention not to make those findings?

11           THE COURT:  I think those issues are moot at this

12  point.

13           MR. MULLIN:  Judge, you have heard my arguments pretty

14  much on the mandatory life.  Mr. Scott also wanted me to bring

15  up the Armstrong selective prosecution issue, he was most

16  emphatic that I include that in my sentencing memo so I did

17  under other issues that he was asking the Court to reconsider.

18  In light of Armstrong, his prior selective prosecution

19  argument --

20           THE COURT:  I read Armstrong last night and again if

21  you go back to the defendant's Motion filed in this matter, I

22  don't believe there was a brief with it, but if you go back to

23  the Motion, it was insufficient as a matter of law pursuant to

24  Armstrong that selective prosecution be demonstrated to the --

25  based on an impermissible motive such as race and the defendant

44

1  failed to make an adequate showing of that in order to obtain a

2  hearing.

3        MR. MULLIN:  I hear Your Honor's ruling on that.  As

4  part of that he wanted me to point out to the Court that he was

5  the only individual who was caught in connection with this

6  particular arrest, Nan Sturdy, Shekida Thompson, he was the only

7  one from Chicago, he was the only one that was facing

8  prosecution in Federal Court, and for that reason that he felt

9  he was being selectively prosecuted.

10        THE COURT:  It was based on geography?

11        MR. MULLIN:  They didn't do it to the Iowa folks, they

12  didn't do it to Nan Sturdy.

13        THE COURT:  Where is Nan Sturdy from?  I don't even

14  remember.

15        MR. MULLIN:  Iowa City.

16        THE COURT:  So it is based on geography?  Yes or no.

17  I don't know.

18        MR. MULLIN:  Yes, Judge.

19        THE DEFENDANT:  No, it is also based on race, that he

20  didn't want to bring that claim forth.

21        THE COURT:  You will get your chance in just a minute.

22        MR. MULLIN:  We didn't make race at pretrial and that

23  was with -- we thought with the understanding that we thought

24  that would be the way we would go and he now wants the issue to

25  mention of race, but certainly he was the only one who wasn't

1 local who was prosecuted federally.

2          Judge, Your Honor's rulings are that these offenses

3 qualify, that he took the life offenses, the life imprisonment,

4 I don't know much else that can be argued on his behalf if Your

5 Honor is intending to grant -- to order the life sentence in

6 this case.  Life would strike me as contrary to 3553(a), it

7 seems to be more than -- more than necessary, greater than

8 necessary to comply with the purposes of 3553(a) in his

9 particular circumstances.  We ask the Court not to impose the

10 life sentence.  Thank you.

11          THE COURT:  Mr. Scott, is there something you wish to

12 say in your own behalf before sentence is imposed?

13          THE DEFENDANT:  Yes, I do.  To cover the grounds of

14 the selective prosecution, I noticed that throughout the Motion

15 and the previous trial Motions that your Order stated that it

16 was defendant that didn't or fail to prove whatever the claim

17 should be.  It was defendant's counsel who failed that.  I have

18 no way to the research of computers, of case laws, only by

19 through the means of the jails which permits me, allowed me to

20 do research to the law.

21          I have explained to you prior to -- prior to my trial

22 at the pretrial hearings for the other Motions that were filed

23 on my behalf from my counsel that I had no -- no whatsoever hand

24 in on those Motions.  That's why I asked you to go pro se.  All

25 right.

1          I just filed a Motion for the retest of drugs.  You

2    denied and said defendant -- you have no claim as to object to

3    -- what is it?  It was the testing of the drugs and said

4    specifically not giving no reasons why I wanted to get the drugs

5    retested.  I specifically communicated to my counsel why I

6    wanted the drugs retested.

7          I specifically communicated to my counsel why I wanted

8    a new trial, I continued to communicate to him and he filed with

9    the Court.  I have no say after he files.  I instructed him to

10   do as I request and what we discussed prior to bringing it forth

11   to the Court.  I have no control over that.  Now I'm speaking my

12   piece in court and every time I do so, it is -- it becomes moot

13   for some reason.

14         As far as the prior convictions, this is the first

15   time ever I ever seen -- I ever seen any of this paper work that

16   has been presented as exhibits to the Court.  I have never seen

17   this paper work before trial, during trial, post trial, ever.  I

18   have never seen this paper work.  The photographs I have never

19   seen, the minimus, I never seen the paper work whatsoever.

20         THE COURT:  You also refused to speak with the

21   probation office to be interviewed, right?

22         THE DEFENDANT:  That had nothing with me doing the

23   paper work.  What does that have to do with the paper work I'm

24   telling you I never seen?  I didn't refuse to speak with them, I

25   didn't want to sign the papers for the -- they asked me to sign.

47

1   I never refused to speak with them.  I was anxious to speak with

2   them.  It had nothing to do with these circuit court official

3   copies that is supposed to be alleged that these are certified

4   copies from Cook County Department of Correction, you know, the

5   Cook County court system before you, Courts rely on exhibits on

6   the government's behalf.  That has nothing to do with it.  I

7   have never seen these before.

8          THE COURT:  Is there anything else you'd like to say?

9          THE DEFENDANT:  If I thought that -- as far as the

10  one-to-one ratio, I want to know why the Judge, that you would

11  not give the Motion any justice put forth and 100-to-one ratio

12  or if he even missed it.  I didn't even know.  I don't

13  understand the back and forth between you two when I spoke.

14         THE COURT:  Anything else you want to say or ask?

15         THE DEFENDANT:  Yes, about the 100-to-one ratio.

16         THE COURT:  Go ahead.

17         THE DEFENDANT:  I ask that the Court to rule in my

18  favor for the one-to-one ratio as it is stated in the sentence

19  memorandum as my understanding that the U.S. Attorney's Office

20  received notification that no objections should be made to

21  Motions for Downward Variances for the 100-to-one to be a

22  disparity of the crack versus powder cocaine and to be adopted

23  by the one-to-one ratio.

24         THE COURT:  Okay.  Is that it?

25         THE DEFENDANT:  Yes.

1          THE COURT:  Ms. Zaehringer?

2          MS. ZAEHRINGER:  Your Honor, we are asking for the

3    mandatory life in this case based on the offense conduct of this

4    case, the role of this defendant played, the defendant's

5    continued criminal history that began at the age of 17, the

6    facts -- another factor is the defendant has a pending serious

7    case and the defendant has no employment history.

8          THE COURT:  In preparing for sentencing, I have

9    examined all of the factors set forth in Title 18, United States

10   Code, Section 3553(a).  I studied the nature and circumstances

11   of this offense and independently recall the testimony at trial.

12   I did extensively study the history and characteristics of this

13   defendant and so I did consider the seriousness of the offense,

14   the question of just punishment, the need for adequate

15   deterrence to criminal conduct, the need to protect the public

16   from further crimes from this defendant, the sentencing options

17   that are available or the lack of sentencing options available,

18   I considered the Sentencing Guidelines, I considered the need to

19   avoid unwarranted sentencing disparity among defendants with

20   similar records who have been found guilty of similar conduct.

21          I was prepared in the event that the government failed

22   to prove that the defendant had two prior felony drug

23   convictions to resolve the Guideline sentencing issues that had

24   been raised by the defendant, but found them to be moot.  The

25   only factual disputes that were ultimately relevant were those

1    related to whether he had been convicted of the crimes set forth

2    in Paragraphs 41 through 43 of the Presentence Report and that

3    rendered the issue regarding the Guidelines moot.

4            The 100-to-one ratio that is being discussed or -- and

5    it isn't 100-to-one ratio when you get to the high end of the

6    Guidelines as this case would be is a Guideline sentencing

7    issue.  It is not a mandatory minimum issue and this case is

8    driven by the mandatory minimum and that's why the Court found

9    the issue very early with regard to the Guidelines to be moot as

10   did the Kimbrough and Speers issues.

11           Having found that the defendant was convicted of a

12   conspiracy to distribute in excess of 50 grams of crack cocaine

13   and having found that he was convicted of two prior felony drug

14   offenses, the Court has no option here.

15           It is the judgment of the Court that the defendant,

16   Angelo Scott, is hereby sentenced to the custody of the Bureau

17   of Prisons for the rest of his natural life on Count 1 of the

18   Indictment.  If for some reason you were released, you'd be

19   placed on supervised release for a term of 20 years.  Within 72

20   hours of release from the Bureau of Prisons you would then be

21   required to report in person to the probation office in the

22   district where you were released.

23           While on supervised release you would not be able to

24   commit another federal, state, or local crime.  You would be

25   prohibited from possessing a firearm or destructive device or

1  illegally possessing a controlled substance.

2          The Court would impose the following additional terms

3  of supervised release:  That you not patronize businesses where

4  more than 50 percent of the revenue is derived from the sale of

5  alcohol; that you submit to mental health evaluation and

6  participate in any recommended treatment; that you submit to

7  regular drug evaluation and substance abuse evaluation, testing,

8  and treatment, and not use alcohol or other intoxicants; that

9  you maintain full-time, legitimate employment, and not be

10  unemployed for a term of more than 30 days unless excused by the

11  probation office and that you submit to a search of your person,

12  residence, adjacent structures, office, or vehicle conducted by

13  a probation officer at a reasonable time and in a reasonable

14  manner based on reasonable suspicion of contraband or evidence

15  of a violation of the conditions of release.  All is more fully

16  set forth in the Judgment and Commitment Order to be entered

17  later today or first thing tomorrow.

18          The Court finds that you do not have the ability to

19  pay a fine.  You are ordered to pay a $100 special assessment to

20  the Victim's Assistance Fund which is due and payable

21  immediately without interest to the Clerk of Court for the

22  Southern District of Iowa.

23          Do you want me to make a recommendation as to where he

24  is incarcerated?

25          MR. MULLIN:  He's requested to be placed either

51

1    Indiana or Atlanta.

2             THE COURT:  Why?  Close to family?

3             THE DEFENDANT:  Yes.

4             THE COURT:  The Court recommends that he be

5    incarcerated in the state of Indiana or Georgia.  You have the

6    right to take an immediate appeal from this Judgment and

7    Commitment Order.  Any appeal has to be filed within ten days

8    after I file the written Judgment.  The written Judgment will be

9    filed either later today or first thing tomorrow morning.

10            MR. MULLIN:  I didn't mean to interrupt.

11            THE COURT:  I'm done.

12            MR. MULLIN:  Mr. Scott has asked the Court appoint

13   substitute appellate counsel in this case.

14            THE COURT:  I don't appoint the attorneys on appeal.

15   Court of Appeals appoints the attorneys on appeal.  Mr. Mullin,

16   do you have anything else?

17            MR. MULLIN:  No, Your Honor.

18            THE COURT:   Ms. Zaehringer, do you?

19            MS. ZAEHRINGER:  No, Your Honor.

20            THE COURT:  We are in recess.

21            (Proceedings concluded at 3:51 p.m., June 25, 2009.)

22

23

24

25

52

1                    C E R T I F I C A T E

2

3

4           I, the undersigned, a Certified Shorthand Reporter of
the State of Iowa, do hereby certify that I was called in the
5   capacity of a Certified Shorthand Reporter to report the
foregoing proceedings in the above-captioned matter and that
6   same was taken down by me in stenotype and later reduced to
Computer-Aided Transcription under my supervision and direction,
7   and that the foregoing Transcript of Proceedings is a true
record of the testimony given and all objections interposed and
8   rulings made thereon.

9

10          I further certify that I am neither attorney or
counsel for, nor related to or employed by any of the parties to
the action in which these proceedings were had, and further,
11  that I am not a relative or employee of any attorney or counsel
employed by the parties hereto or financially interested in the
12  action.

13

14          Dated at Davenport, Iowa, this 20th day of July,
2009.

15

16                      /s/ Linda Faurote-Egbers
                        Certified Shorthand Reporter
17                      and Notary Public
                        Linda Faurote-Egbers
18                      Notarial Seal
                        Commission Number 223944
19                      My Commission Expires 8-10-11

20

21

22

23

24

25